## Brown vs. Slauson.

*Agreement for sale of chattels — Statute of frauds.*

An agreement that defendant was to buy a vessel, pay the purchase-money, and take the title in his own name, and was then to sell the plaintiff one-quarter of the vessel, *held* to be void under the statute of frauds.

APPEAL from the Circuit Court for *Racine* County.

The complaint alleges, that, in August, 1865, at the city of Racine, the plaintiff, *Martha Brown*, by her agent John W. Brown (who was and is her husband), entered into an agreement with the defendant, whereby plaintiff, by her said agent, was to go to Cleveland, Ohio, and there inspect the bark "Red, White and Blue," and if the same was satisfactory to the agent, agree with the owner for the purchase thereof — defendant to pay the traveling expenses of said agent, and plaintiff, by her said agent, to make such journey, inspection and agreement; that, in case of an agreement of purchase with the owner of such bark, the purchase price thereof should be paid by defendant, and the title taken by him, and in consideration of the service so to be rendered by plaintiff, and of the agreements hereinafter mentioned, plaintiff was to have and receive from defendant the title to one quarter of said vessel for a sum equal to one-quarter of the whole purchase price to be paid therefor, and said John W. Brown was to take charge of the vessel as master, with a salary equal to that usually paid for commanding vessels of her class, and was to continue in command of said vessel until said quarter interest was fully paid for; said quarter interest to be paid for by the plaintiff as follows: by a quarter of the net earnings of the vessel, and such other moneys as plaintiff should see fit, from time to time, to advance and pay, until said interest should be wholly paid for, when defendant was to convey to the plaintiff a perfect title to said quarter interest. It is then alleged, that, pursu-

ant to said contract, plaintiff's said agent proceeded to Cleveland, inspected the vessel and found her satisfactory, and entered into a contract with the owner for the purchase thereof for $32,000; that defendant paid that sum, and took the title in his own name; that plaintiff furnished the time and expenses of her said agent, and defendant paid his traveling expenses; that immediately after the purchase, and pursuant to the agreement aforesaid, John W. Brown took charge of said vessel as master, and continued to command her until August 20, 1866, when defendant, without just cause, and in violation of said agreement, and without consultation with the plaintiff, discharged him from the command of the vessel; that since such purchase, and up to the close of the sailing season of 1866, the bark has made about $19,000 net earnings, all of which defendant has appropriated to his own use; that plaintiff has been at all times ready and willing to perform said contract on her part; that on the 31st of December, 1866, she offered to fulfill it on her part, and tendered to defendant full peformance thereof, and demanded an account of said net earnings, and that one-quarter thereof be applied upon her said contract of purchase, and offered to pay in cash to defendant any deficiency due upon said purchase after such application, and demanded of him a bill of sale of an undivided quarter of said vessel, which defendant refused. It is further alleged, that, at the time said contract was entered into, she had separate estate, upon the faith of which she entered into it; that she has ever since had such separate estate; and that the cash offered as aforesaid was realized upon the credit thereof. Damages in the sum of $10,000 are alleged, and a judgment therefor demanded.— The answer denies that John W. Brown, when he went to Cleveland to inspect said vessel and arrange for its purchase, did so in pursuance of any agreement between plaintiff and defendant; or that he took charge of the vessel in pursuance of any such agreement.

On the trial, John W. Brown, as a witness for the plaintiff,

testified that about the 1st of August, 1865, he had agreed with one Lathrop to look up a vessel that would cost $15,000 or $18,000, and if he could find one to suit, *Mrs. Brown* was to have one-third, and witness was to sail the vessel until the price of said one-third should be paid; that *Mrs. Brown* was to pay down such money as she had, and the balance was to be paid out of the earnings of the vessel; that on the 14th of the same month witness had a conversation with defendant, who proposed to take a third interest in the "Red, White and Blue," if that was agreeable to Lathrop and *Mrs. Brown*, "so that he could go in company with them. And he said, if Mr. Lathrop didn't wish to go in company, he (defendant) would purchase the whole vessel, and would sell my wife one-quarter, and she could pay what she wanted down, and the balance was to be paid out of the earnings of the vessel; it was to draw interest at 7 per cent; and I was to sail her as master until such time as she had been paid for. Afterward the 'Red, White and Blue' passed down through Detroit from Marquette. On the 17th of August, *Slauson* wanted me to go down and buy her, if she suited. He said he would purchase the vessel, and pay the money, and take the title in his own name; and that as soon as *Mrs. Brown* paid for one-quarter, he would make her a title, and she might pay what money she had, and the balance she could pay out of the earnings of the vessel." Witness went to Cleveland and inspected the vessel, and on his favorable report defendant paid the price asked, and took the title in his own name; and witness took control of her as master soon after, according to defendant's instructions, and under an agreement with defendant that he was to run her as master upon a salary until plaintiff paid for said quarter interest; and he testifies that he would not have taken charge of her except upon this agreement. This witness also testified, that in August, 1865, plaintiff had separate property of her own, real and personal, worth about $22,000; that she still had most of this

property in December, 1866, when she tendered to plaintiff payment for the quarter interest in said vessel; that the witness borrowed the money in her name to make said tender, offering to secure the same (if accepted by defendant) upon said quarter interest in the vessel. On cross-examination, he said that his wife had no separate property when he married her, and stated the methods by which the title to the above-mentioned property became vested in her; but, as the questions arising out of this evidence are not considered by this court, the evidence is omitted.

The court nonsuited the plaintiff; and she appealed.

*C. W. Bemnett,* with *Fuller & Dyer,* of counsel for appellant, discussed at length the power of the plaintiff to engage in business on her own account, and contract for the purchase of a vessel. They further argued that the contract in this case was not void by the statute of frauds, because it was not an agreement by defendant to sell to plaintiff a quarter interest in the vessel, but an agreement between the parties to make a *joint purchase* of the vessel from a third party, to become tenants in common thereof, and *partners* in her earnings; and this action is for a breach, *not* of a contract of sale, but of an agreement to *convey* to the plaintiff a *title* which she purchased jointly with him — a title to property which she owned in equity when plaintiff took the legal title. This contract was, in effect, a copartnership agreement, each party having an interest in the earnings of the vessel. Is a contract of copartnership void, within the statute of frauds, simply because the legal title to personal property, out of which the profits arise, is taken in the name of an individual partner? But suppose this is a contract of sale from defendant to plaintiff, still it is binding under subdivisions 2 and 3, § 3, chap. 107, R. S. 1. The plaintiff, by her agent, went into possession of the bark immediately upon its purchase. 2. If the consideration, or some part of it, to be paid for goods, be not money, but services, the performance of

those services, being a substitute for the payment in money, fulfills the requirements of the third subdivision. Plaintiff furnished the time and services of her agent in going to Cleveland, inspecting the vessel, and agreeing with the owner upon the terms of purchase. Again, as part of the consideration, plaintiff's agent was to take charge of the vessel as master, and this he did. Again, as fast as net earnings were made, they were to be applied to the payment for plaintiff's quarter interest. The moment defendant received these earnings (all of which he has appropriated), one-quarter of them became a payment to that amount on the contract.

*John W. & A. L. Cary,* for respondent, argued, among other things, that it did not appear from the evidence that the time and services of Mr. Brown formed any part of the consideration for the quarter interest which plaintiff claims to have contracted to purchase ; and she could not furnish the time and services of her husband, because in law they were his and not hers. 2. The evidence shows that Brown took possession " as master," according to defendant's instructions, and not as agent for his wife.

Cole, J. Whether the property mentioned in the case could really be treated as the wife's separate estate, having been derived from her husband in the manner it was ; or whether, if it were her property, buying an interest in the vessel was incident to the proper disposition and enjoyment of her separate estate, are questions which need not be considered, since we are satisfied that the alleged contract was void by the statute of frauds. To escape the force of this objection, it is claimed that the purchase of the bark was a joint purchase, made by the plaintiff and defendant together, and that they took possession of and owned the vessel as tenants in common. But the testimony fails to show that this was the contract. On the contrary, the husband, three or four times in his testimony, says, in

effect, that the agreement was that *Slauson* was to buy the vessel, pay the purchase-money, and take the title in his own name; and that he was to sell *Mrs. Brown* one-quarter of the vessel, she paying what she could down, and the balance to be paid out of the earnings; the husband to sail the vessel until she was paid for. This is the substance of the agreement as testified to by Brown. The contract of sale, then, was between the plaintiff and defendant. There was no money paid upon this contract. It is true, the husband went to Cleveland to inspect the vessel and negotiate with the owner for the purchase thereof. But he tells upon what terms he went. He was to furnish his time, and *Slauson* was to pay his expenses. This was for the purpose of looking up a vessel, and before any purchase whatever was made. But when the vessel was purchased, it was purchased by the defendant, who took possession by his agent, the husband, as master. And the husband continued to sail the vessel for the defendant, until he was discharged in August, 1866. The agreement undoubtedly was, that he was to sell *Mrs. Brown* a one-quarter interest upon the conditions named. But, upon the facts of this case, that agreement cannot be enforced. It is strictly within the statute of frauds.

*By the Court.* — The judgment of the circuit court is affirmed.